Barbara HOULTZHOUSER,
Employee–Appellant,

v.

CENTRAL CARRIER CORPORATION,
Employer–Respondent,

and

Aetna Casualty & Surety Company,
Insurer–Respondent.

No. 20960.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 24, 1997.

John R. Lewis, Fred C. Moon, Timothy J. Harris, Lewis & Moon, Springfield, for appellant.

William D. Powell, Daniel, Clampett, Powell & Cunningham, LLC, Springfield, for respondent.

SHRUM, Judge.

Barbara Houltzhouser (Claimant) appeals from a final award of the Labor and Industrial Relations Commission (Commission) which affirmed the award of the Administrative Law Judge (ALJ). The final award allowing compensation determined the amount of compensation payable to be $38,442.60, or 180 weeks at a rate of $213.57 based on a permanent partial disability of 45% at the 400 week level, thus denying Claimant's claim for compensation based on permanent total disability. We affirm.

Claimant, age 51 on the date of injury, has a 7th grade education. Her prior work experience includes jobs as a machine operator and assembler in various factories. In 1983, she began to own, operate, and manage tractor-trailer units.

On the date of injury, Claimant was an employee of Central Carrier Corporation (Employer), which was insured by Aetna Casualty & Surety Company (Insurer). On that date, October 31, 1991, Claimant was driving a tractor-trailer in the course and scope of her employment with Employer when the truck slid on some ice and hit an embankment. As a result of the accident, Claimant's spine was fractured at T12. Claimant initially underwent two procedures, a Harrington instrumentation from T10 to L2, and a posterior and lateral fusion from T11 to L1. She was then referred to Robert Hufft, M.D. for follow-up care. On December 11, 1991, Dr. Hufft removed the Harrington instrumentation, performed a laminectomy at T11, T12, and installed a new instrumentation.

Subsequently, Dr. Hufft referred Claimant to a work hardening program at the Regional Center for Sports Medicine and Rehabilitation, which she began on April 13, 1992. Upon completion of the program on August 3, 1992, Claimant's occupational therapist, Nancy Dickey, made the following assessment:

"[Claimant] demonstrates ability to tolerate activity for 3 1/2 hours but not beyond that point."

"At this time, [Claimant] functions at a light work load in terms of lifting. Light work requires more frequent lifting of 10 pounds and an occasional to maximum lift of 20 pounds. Client does not demonstrate the endurance to tolerate an eight hour work day and light work (usually requires standing for the majority of the work day)."

Also as part of the program at the Regional Center for Sports Medicine and Rehabilitation, Claimant was tested and evaluated by a certified rehabilitation counselor, Gregory N. Wright (Wright). In his report dated June 19, 1992, Wright noted that Claimant's testing showed low average aptitude, but at a level "sufficient to predict some vocational success." Wright also recommended several positions as "feasible" for Claimant, including Steward/Stewardess, Customer Service Representative, Medical Assistant, and Passenger Service Representative. Wright also recommended two further positions "which require more extensive training but would appear to be within [Claimant's] measured capabilities[,]" Airline Reservation Agent and Travel Agent.

Claimant's treating physician, Dr. Hufft, evaluated her on November 19, 1992, stating in his records:

"Partial permanent impairment 25% to the body as a whole. . . . Weight lifting limits, pushing, pulling, lifting is 30 lbs and I pointed out that she needs to be careful with how she lifts, not only the amount that she lifts. Standing, sitting, and walking should not be more than an hour and a half at a time without changing positions. No climate restrictions. No restrictions on the use of the upper and lower extremities. Climbing should not be more than 6 ft high for safety reasons. No indications for xrays nor for ongoing evaluation or treatment. Does need to continue with physical exercises for flexibility and strength."

Claimant's attorney referred her to Aly Mohsen, M.D., for an examination and evaluation of her condition. Dr. Mohsen found that Claimant had an impairment of 46% for the body as a whole. Dr. Mohsen noted that claimant had a significant functional limitation and suggested that a vocational rehabilitation specialist "should be considered in evaluating her condition." Without stating his qualifications or training as a vocational expert, Dr. Mohsen expressed his opinion that Claimant represented "a case of permanent total disability."

As part of the ongoing evaluation process, Claimant was seen by two more certified rehabilitation counselors, both of whom testified at the hearing. The conclusions of one of them, Wilbur T. Swearingin (Swearingin), are summarized in the second of two reports prepared for Claimant's attorneys:

"As a result of her medical and vocational restrictions, [Claimant] is unable to perform any of her past work and does not have vocational skills transferable to Sedentary semi-skilled or skilled occupations. . . . Considering [Claimant's] physical restrictions to less than full time work, her inability to perform her past work, her lack of transferable job skills, her seventh grade education, her low vocational aptitude and advanced age, it is unlikely an employer would consider hiring [Claimant] in the normal course of business. . . . [Claimant] is neither employable nor placable in the competitive labor market and is considered permanently/totally disabled."

The other certified rehabilitation counselor who evaluated Claimant was Michael K. Lala (Lala). Lala also testified at the hearing, and his conclusions are also best summarized by his report, prepared for Employer's and Insurer's attorneys:

"Based on my review and understanding of this material, it is my professional opinion that [Claimant] is not permanently totally disabled from engaging in work in the open labor [market]. [Claimant] would be able to engage in light and sedentary positions. She would be able to use her knowledge of the trucking industry to over see [sic] and manage trucks for a profit. She would also be able to use her understanding of the industry to work as a

dispatcher. Other examples of work for [Claimant] would be employment as a telephone marketer, a bill collector, or a companion. These entry level positions would be well within the work restrictions outlined above. Employers in this area are constantly seeking individuals to fill these positions. [Claimant] would be able to directly enter the labor market and be competitively employed."

The ALJ, whose award was adopted by the Commission, found that Claimant was not permanently and totally disabled. Instead, the ALJ found that Claimant had a significant 45% permanent partial disability and awarded benefits based on that finding. In so doing, the ALJ specifically found that Claimant's degree of disability does not preclude her from competing in the open labor market.

In Claimant's first point, she contends that the Commission's award was not supported by the facts found by the ALJ and the Commission. This contention is subsumed by her allegations of error in Points II and III.[1] We will consider any arguments presented by Claimant solely in Point I as we address Points II and III. In Point II, Claimant asserts that the award is not supported by competent and substantial evidence. In Point III, Claimant asserts that the Commission's award is contrary to the overwhelming weight of the evidence.

We examine Claimant's allegations of error within the rubric of the applicable standard of review, which was stated in *Davis v. Research Medical Center*, 903 S.W.2d 557 (Mo. App.1995):

"[T]he standard of review of an award of the Commission is as follows. The reviewing court may not substitute its judgment on the evidence for that of the Commission. The weight of the evidence and the credibility of witnesses are ultimately for

the Commission. The court applies a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, it takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings."

*Id.* at 571. Moreover, *Davis* makes it clear that in the first step, the appellate court must disregard any evidence supporting any finding different from those made by the Commission. *Id.* at 566[5]. However, during the second step of the analysis, opposing, unfavorable evidence must be considered and may not be disregarded. *Id.* at 566[7]. Finally, we note that *Davis* contemplates the applicability of the two-step analysis not only to "reviewing cases where the Commission has reversed the findings and award entered by the ALJ," but also to "cases where the

1. Claimant's confusion over the proper standard of review is not entirely unjustified, given the variety of sources which state it. The key language she incorporates into her first point is derived from the statute, § 287.495, RSMo 1994. However, appellate courts have developed "cer-

tain well-established principles" from the statute and Mo. CONST. art. V, § 18. *See Pullum v. Hudson Foods, Inc.*, 871 S.W.2d 94, 96 (Mo.App. 1994). Appellate courts have molded these principles into the two-step standard of review we state below.

Commission affirms or adopts the findings and award made by the ALJ." *Id.* at 570–71. In the latter type of case, which mirrors the procedural posture of the instant case, *Davis* adds an additional factor to be applied in the two-step analysis:

"Of course, in cases where the Commission affirms or adopts the findings and award made by the ALJ before whom the witnesses in the case testified in person, the resulting consistency, especially as concerns credibility determinations, is a powerful factor in favor of upholding the Commission's award on appeal."

*Id.* at 571.

■ As a final prelude to our application of the two-step analysis, we note the standard for determining whether Claimant was permanently and totally disabled, as she claims she is: "The ... general test [is] whether the person is able to compete on the open job market[, and] ... the key question to be answered [is] whether an employer, in the usual course of business, would reasonably be expected to employ the person in his present physical condition." *Story v. Southern Roofing Co.*, 875 S.W.2d 228, 232–33 (Mo.App.1994).

■ Turning to the first step, we first consider Claimant's representation that the award was not supported by competent and substantial evidence because only one expert, Lala, concluded that Claimant was capable of working an eight-hour day. In conjunction with this, Claimant cites *Grgic v. P & G Const.*, 904 S.W.2d 464, 466 (Mo.App.1995), for the proposition that an inability to work more than a few hours a day is a "hallmark of 'odd-lot' total disability." However, Claimant's ability to work an eight-hour day is supported by a considerable amount of evidence in the record.

Dr. Hufft's evaluation of Claimant released her to work with a restriction that she not stand, sit, or walk for more than an hour and one half without changing positions. Dr. Hufft placed no restriction on the number of hours Claimant should work; therefore, the reasonable inference is that his opinion was that she was capable of working an eight-hour day.

Much is made of the wording of the conclusion of Dickey, the occupational therapist, reproduced above. However, as the ALJ observes, Dickey's opinion does not address Claimant's inability to tolerate an eight-hour day at any level other than light work. Viewed in the light most favorable to the award, we must accept the ALJ's interpretation (affirmed by the Commission) of this testimony despite the arguable existence of an alternative interpretation. The reasonable inference is that Dickey does not say that Claimant cannot work an eight-hour day at the sedentary work level.

Two more experts, both vocational experts, support the conclusion that Claimant can work an eight-hour day. Lala concluded that Claimant could function in a number of light and sedentary positions, while Wright opined that Claimant could expect some occupational success and named several feasible positions. Based on this evidence and that mentioned in the preceding two paragraphs, Claimant's insistence that the record lacked substantial and competent evidence that she could work an eight-hour day is unavailing. Consequently, Claimant's contention that this record compels a finding that she is totally and permanently disabled fails under the standard established in *Story*, 875 S.W.2d at 233.

Given the opinions of Dr. Hufft and Dickey as to Claimant's degree of impairment and Lala and Wright as to her potential for employability based on their examination of reports concerning her physical condition, there is likewise substantial and competent evidence that an employer could reasonably be expected to hire Claimant despite her age, educational level, degree of physical impairment, and vocational aptitude. Lala and Wright specifically reference these limitations in arriving at the conclusion that Claimant is employable and hence not totally disabled.

In this first step, having disregarded evidence unfavorable to the award, we cannot conclude that the award was without substantial and competent evidence to support it.

Therefore, we turn to the second step of our review, in which we consider opposing, unfavorable evidence in deciding whether the award is against the overwhelming weight of the evidence. In arguing that it was, Claimant asserts that "[a]ll of the medical and expert evidence presented, with the exception of Mr. Lala's opinion, concluded that [Claimant] was permanently total [sic] disabled and unable to compete in the open labor market." As can be seen from our discussion in the first step of our review, this is simply not the case. Indeed, the evidence presented by Dr. Mohsen and Swearingin would support a finding that Claimant is totally and permanently disabled. However, the testimony and evidence to the contrary summarized in the first step of our review presented a credibility and weight of the evidence question to the ALJ. The ALJ found the Respondents' evidence to be credible, as did two of the three Commission members. Given this consistency and the clear wealth of evidence supporting the award, we will not disturb the Commission's award because we cannot say that it is against the overwhelming weight of the evidence.

We affirm the Final Award Allowing Compensation.

MONTGOMERY, C.J., and PARRISH, J., concur.